UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

BYRON S LLOYD #610611             CIVIL ACTION NO. 19-cv-433 SEC P

VERSUS                             CHIEF JUDGE HICKS

DARREL VANNOY             MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

Byron Spencer Lloyd ("Petitioner") was charged with second-degree murder and, after a bench trial before Judge Bleich, he was convicted and given a mandatory life sentence. Petitioner's conviction was affirmed on direct appeal. State v. Lloyd, 161 So.3d 879 (La. App. 2d Cir. 2015), writ denied, 184 So.3d 33, recon. denied, 186 So.3d 1176 (La. 2016). Petitioner also filed a post-conviction application in state court. After it was denied, he filed this federal habeas corpus petition and asserted several claims. For the reasons that follow, it is recommended that his petition be denied.

**Trial Evidence**

Petitioner was 41 when he was involved in what began as a relatively minor road rage incident with 54-year-old Ray Williams on December 19, 2011. When Petitioner turned from Jefferson Paige Road into his mother's driveway, Williams turned around and pulled into the driveway behind Petitioner. Petitioner armed himself with a 9mm pistol and fired a single bullet into Williams' head. The forensic evidence showed that the bullet was fired through Williams' open driver window from a distance of about 12 inches.

After the incident, Petitioner went inside his mother's home, told her that he had shot someone, and left with a frozen pizza that he had come to collect. He went home and hid his pistol and a box of ammunition under a trash can. Petitioner's mother eventually telephoned police and reported a suspicious vehicle in her driveway. The police found the victim with his foot on the brake, his car still in drive, and his small dog covered in the victim's blood. A neighbor, Daniel Leloup, told police that he saw Petitioner standing at the driver's door of the car and then heard a pop.

Peggy Lloyd, Petitioner's mother, testified that Petitioner entered her home in a panic and said he might have shot someone. He said the gun discharged "in a spur of the moment or something to that effect" and he wanted her to come outside to see. Ms. Lloyd said that she was afraid and went no further than the end of her open garage. She could see the car, but the headlights were so bright that she could not see inside it.

Ms. Lloyd testified that Petitioner asked her to call 911. She said that she told Petitioner that she would do so, but she first called her sister. Phone records indicated that the call to the sister was made at 7:20 p.m., but police were not called until 8:42 p.m. There was testimony about a "911 call," but Ms. Lloyd also said that she had to go get the phone number that she was told to call for the desk of the police department when she needed help. When Ms. Lloyd called police, she told them that there was a car in her driveway with lights on, but she did not alert them that someone had been shot. She also did not tell the first officer on the scene what she knew about her son's involvement.

Ms. Lloyd testified that her son graduated from Louisiana Tech with a bachelor's degree in graphic design, and he taught art at various schools until he was in a motorcycle

accident in 2010 (the year before the shooting).  He was in LSU intensive care for eight days, then transferred to the VA hospital where he stayed for five more days.  He had a stroke after the accident that caused paralysis on the right side.  After he was released, he was treated by an occupational therapist, speech therapist, physical therapist, and other healthcare providers over the course of several weeks.  After the accident, he used a cane to walk more than a short distance.  He was unable to work and qualified for social security disability benefits.  Ms. Lloyd testified that Petitioner could not hold a glass or ball in his right hand, and he could not even write his name beyond a scribble.  He was able to drive, primarily using his left hand.  He was taking 10 or 12 medications, including seizure medicine, at the time of the shooting.

Daniel Leloup testified that he had lived near Petitioner's mother for several months, and he had seen Petitioner and his Nissan Titan truck there many times; he believed Petitioner lived there.  He had been working on his own truck the evening in question when he noticed Petitioner talking to someone in a car.  He could not hear the conversation, but he was sure there was no screaming or hollering.  He did hear a pop that he thought might be a gunshot, but he thought it might also be fireworks because it was during the holiday season.

Leloup noticed, about two or two and a half hours later,  that the car was still there, with no one nearby.  He thought it strange that the car was still there running, headlights on, and no one around.   He saw a police officer drive up, and he went to tell the officer what he had seen.  The officer told Leloup that he received a call from the lady of the house, who said there was a suspicious vehicle in the driveway.  Leloup told the officer how he

might have heard a gunshot.  He then approached the car with the officer and saw that the driver had a bullet hole through his left temple.

Shreveport Police Officer Steve Gipson testified that he received a call from dispatch at 8:50 p.m. of a suspicious vehicle parked in the yard of a residence.  He found the car running with headlights on.  The car was in drive.  He saw that the window was down and a male, determined to be Ray Williams, was sitting in the front seat with what appeared to be a single gunshot wound to the head.  Officer Gipson said Mr. Leloup then approached, and Gipson asked him to stand by while he called dispatch to report the shooting.  Gipson said that Mr. Leloup told him that, about an hour before the officer arrived, he was on his porch and saw Petitioner arguing with the victim, walk closer to the victim's car, and then he heard a pop that he thought might be firecrackers.  Leloup told Gipson that Petitioner then walked back to his vehicle, said something that Leloup could not hear, then maneuvered his vehicle around the victim's car and left.

Officer Gipson testified that he rang the doorbell on the house, and Peggy Lloyd answered.  He asked if she knew who was in the car.  She said no, she just knew the car was parked in her yard and she saw it from her security monitor.  She denied that she saw or heard anything else.

Detective Kevin Strickland was the lead detective.  He said he was originally called for a potential suicide, but he was told it was going to be a homicide investigation because no weapon could be located and the man had been shot.  He saw the injury to the victim's head, a hat in the backseat that appeared to have a hole in it, and bodily fluid or substance on the front passenger window.  He spoke to Ms. Lloyd, who made the 8:42 p.m. call.  She

told Strickland that she noticed the car in her driveway and did not know there was anyone in it until police told her.  She said her son drove a silver truck and had been there recently, but she did not mention that her son said that he shot someone.  Strickland told Ms. Lloyd to get in touch with her son and have him meet him at the police station.  Detective Strickland then went to the police station, where he interviewed Mr. Leloup and others. Petitioner arrived after midnight.  After being advised of his rights, Petitioner said he wanted an attorney, but he later initiated contact with the officers and said he wanted to give a statement without an attorney.

Petitioner's recorded statement to police was played in open court.  A transcript is in the record at page 678-90.  Petitioner told police that he was driving to his mother's house when he came up behind a car that was going much slower than the 45-mph speed limit.  Petitioner flashed his lights, and the car went even slower.  Petitioner signaled and turned in his mother's driveway.  The victim then turned around and pulled in behind him. Petitioner said he did not know how many people may have been in the car or what their intentions were.  He grabbed his 9 mm with his right hand, even though it was weakened by his stroke, and "cocked" it.  "And before I even knew it, walking up to his window," the gun fired.  Petitioner said he thought the round may have been fired through the ceiling or gone over the car, so he shook the driver and asked if he was all right.  He then noticed that the driver had been shot and that there was "some stupid dog in the car."  Petitioner ran inside and told his mother to call 911 because, "I done accidentally shot somebody out here."  He then left, hid his gun in a "secret location" outside his home, and eventually called his cousin who drove him to the police station.

Detective Strickland testified that no shell casing was found at the scene of the shooting, and Petitioner never indicated that he picked up the casing that would have been ejected when the semiautomatic pistol was fired. Strickland said there were no bullet holes in the windshield of the victim's car or elsewhere in the body of the vehicle. The driver's window was down, and there appeared to be a single shot to the victim's forehead. He could see the fired bullet on the passenger-side floorboard. Strickland said that he spoke to Ms. Lloyd several times at the crime scene and police station, but she never said that her son was involved in the shooting until a third interview at the police station at about 3:00 a.m. She then said that Petitioner came in, told her that he shot a man in the driveway, then asked her to call 911.

Petitioner voluntarily testified before the grand jury, with counsel present. That testimony was played in open court during Detective Strickland's testimony. A transcript of the testimony is in the record at pages 125-95. Petitioner told the grand jury that he approached the slower moving car and flashed his lights, and the car then slowed down about another 10 mph. Petitioner said the other driver put on his brakes as if he was trying to make Petitioner hit him. It was dark outside, so he could not see how many people were in the car. Petitioner said that he continued to drive slowly behind the car for the short distance remaining to his mother's house. Petitioner turned in the driveway and opened the garage door. He was going to run in and grab a pizza from the freezer, but he noticed the other car turn around and park behind him in the driveway. Petitioner said he got his Taurus 9 mm pistol out of the center console of his truck. He worked the slide to load a

cartridge from the magazine into the chamber, which made the gun ready to fire. The safety was off.

Petitioner told the grand jury that he stood at the rear of his truck, pointed his pistol at the car and told the person that he "better get the hell out of my driveway." He repeated this a couple of times, and the car stayed put. "And at that time the gun just discharged, the gun fired." Petitioner testified that he did not mean to shoot the man, and it may have "been a reflex since I've had the stroke." Petitioner then approached the driver's side, where the window was down, and he yelled that the man better get out of his yard. He then saw there was only one person in the car, and the man was not moving. He noticed blood coming from the man's forehead and asked if he was all right.

Petitioner testified that he then ran in the house and told his mother to call 911 because he thought he shot someone. He got in his truck, maneuvered around the victim's car, and drove home with the pizza. Petitioner said that he hid his gun and a box of ammunition by his trash can. He denied picking up the shell casing from the fired round. He later called his cousin to take him to the police station. A grand juror asked if the bullet he fired went through the windshield, and Petitioner said that was what the police told him. Petitioner was asked if the victim ever verbally threatened him. Petitioner answered, "Not to my knowledge." He denied that the victim ever opened his car door. The prosecutor asked: "So you're not saying you shot him in self-defense; you're saying you shot him accidentally" Petitioner answered, "I shot him accidentally."

Marcus Jackson, Petitioner's cousin, testified that Petitioner called him and asked him to come help. Petitioner said an accident happened, and he shot someone. Jackson

said that Petitioner was babbling, crying, and seemed about to have a heart attack. Jackson drove Petitioner to the police station. Jackson told the grand jury that Petitioner told him that he flashed his lights, honked his horn, and revved his engine while he was behind the victim. At trial, Jackson said he could not remember what he told the grand jury.

Corporal John Madjerick, a crime scene investigator, testified that the victim had a wound just above the left eye. His window was down, and no holes were found in the windshield or elsewhere on the car. The fired and deformed bullet was found on the passenger side floorboard. Despite an extensive search, no shell casing was found.

Dr. James Traylor, a forensic pathologist who performed the victim's autopsy, testified that the bullet track was from front to back, left to right. He explained that gunpowder particles impregnated the surface of the victim's skin, which indicated an intermediate range of fire gunshot wound. He said that, depending on the caliber of the weapon, an intermediate range can be as little as six inches out to about 18 inches. If it is closer than that, there would also be soot around the wound. If it were fired from further back, there will not be soot or tattooing, just a hole with a marginal abrasion. Dr. Traylor estimated that the gun was fired from about a foot away.

Carla White, a firearms examiner with the crime lab, testified that she examined the murder weapon, a Taurus PT 92. She explained that the particular Taurus model (which is a semi-automatic with an external hammer) could be fired in single action or double action. The trigger pull was about 6.5 pounds for single action and 9.5 pounds for double action. Her research on similar pistols suggested that the average trigger pull for single action

would be from five to seven pounds, and eight to twelve pounds for double action. Thus, the trigger was not excessively light or heavy.

Sarah Williams, the victim's sister, testified that Williams was 55 when he died. He had a journalism degree from Louisiana Tech and worked in several area television stations. He had three successful sons and was active in his church. On cross-examination, it was brought out that the victim had a prior DWI, some minor criminal history, and was driving under suspension. Betty Williams, the victim's mother, offered similar testimony.

**Audio Recordings; Hearsay Objection**

Audio recordings of Petitioner's statement to police and Ms. Lloyd's telephone call to police were played at trial. Petitioner argued on appeal that the actual recordings were not introduced into evidence. Petitioner also complained on appeal that the trial court erred in overruling a hearsay objection to allowing Officer Gipson to testify about what Mr. Leloup told him when Gipson arrived at the scene.

During the habeas screening process, the court pointed out that it appeared Petitioner did not exhaust his state court remedies with respect to these claims, as required by 28 U.S.C. § 2254(b)(1)(A). Petitioner conceded that these claims were not exhausted and stated he wished to dismiss both claims. Doc. 7. Accordingly, no relief is warranted with respect to these claims.

**Exhaustion Defense to Other Claims**

Petitioner presents four claims in his federal habeas petition that he presented to the state appellate court, but his attorney did not include in his writ application to the Supreme Court of Louisiana. Those claims are (1) sufficiency of the evidence (other than on self-

defense); (2) no examination of Mr. Leloup's grand jury testimony; (3) incomplete transcript of Petitioner's grand jury testimony; and (4) involuntary confession/statement. The State argues that each of these claims must be dismissed because Petitioner failed to exhaust his state court remedies with respect to them.

After the State briefed the case, Petitioner filed a Motion to Expand the Record (Doc. 28), which the court granted. The exhibits submitted by Petitioner include correspondence, a copy of an unsigned writ application, and other material that suggest Petitioner filed a pro se supplemental writ application with the Supreme Court of Louisiana that did present and exhaust these claims. In light of this additional material, the court finds adequate evidence of exhaustion and will address these four claims on the merits.

**Sufficiency of the Evidence**

Petitioner's first habeas claim is that the evidence was insufficient to support his conviction for second-degree murder because the State failed to present evidence proving that he intentionally shot and killed the victim. He argues, in the alternative, that the evidence supports only a verdict for the lesser crimes of manslaughter or negligent homicide. A separately briefed claim argues that it was established that this was a justifiable homicide based on self-defense. All of these arguments are challenges to the sufficiency of the evidence and will be addressed together.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson

inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

Second-degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1). A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm, and the killing is necessary to save himself from that danger. La. R.S. 14:20(A).

The state appellate court reviewed these elements and recognized that the State had the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. The appellate court then conducted a detailed review of the trial evidence and assessed the trial judge's verdict in light of the Jackson standard. The court found that the evidence, when viewed in the light most favorable to the prosecution, was "more than sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of second degree murder." Petitioner admitted that he fired the fatal shot, and Dr. Traylor testified that the pistol was fired from a distance of about one foot. The crime scene evidence indicated that Petitioner fired the gun while standing at the open window, just as Mr. Leloup saw him standing at the time Leloup heard a popping noise. Petitioner fled the scene, did not use his cell phone to call 911 to report the shooting or seek medical assistance for the victim, and hid his weapon and ammunition. All of these

actions, found the appellate court, were indicative of Petitioner's specific intent to kill the victim and avoid the consequences of his actions.

Petitioner argued on appeal, as he does here, that Mr. Leloup was not a credible witness.  He points to conflicts in Leloup's estimates of the amount of time that passed while the victim's car sat in Ms. Lloyd's driveway, and whether it was light or dark out. But the trial judge, who observed Mr. Leloup and found him to be credible, concluded that those matters were not significant.  The appellate court afforded deference to the factfinder's credibility assessment.

Petitioner argued that the trial judge should have found that the shooting was accidental due to Petitioner's medical deficits from his stroke.  The court pointed out that Petitioner was not so disabled that he could not retrieve his gun, work the slide to load it, fire it, then flee the scene and conceal the weapon at home.  The close distance of the shooting was also found to undermine the assertion of an accidental shooting while Petitioner stood at the back of his truck.

The trial court found that there was no provocation by the victim sufficient to justify his killing in self-defense.  The victim merely turned into the driveway of Petitioner's mother.  There was no evidence, from Petitioner or elsewhere, that the victim made any threat to Petitioner or even attempted to get out of his car.  The evidence showed that Petitioner had walked up to the driver's side door at the time of the shooting, which was not consistent with self-defense.

The state courts adjudicated these claims on the merits, and the appellate court's decision, as the last reasoned decision, controls for habeas purposes.  Wilson v. Sellers,

138 S.Ct. 1188 (2018). Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

Petitioner argues that the State presented only circumstantial evidence that he intended to shoot the victim. That circumstantial evidence is said to include the testimony of Dr. Traylor about the proximity of the gun when fired, testimony of the firearms expert about the trigger pull of the weapon, and Petitioner's post-shooting conduct in fleeing the scene, hiding his weapon, and failing to call 911. Petitioner states that he believed his mother would call 911, and he notes that he voluntarily went to the police station within hours of the shooting and gave a statement to police. He says he did not attempt to dispose of the firearm by throwing it away; rather, he placed it in a location away from his children. He also continues to attack Mr. Leloup's testimony because of inconsistencies or mistakes about whether it was daylight outside and how much time passed between the shooting and the arrival of police. He invokes his physical problems in support of his claim of an

accidental shooting, and he argues that the shooting was justified because the driver of the car remained in defiance of his request for him to leave.

These were perhaps good arguments to make in the trial court, but the trial judge as fact finder assessed them and found them wanting.  The state appellate court applied Jackson to the evidence and held that the verdict withstood review under that standard despite the several arguments raised by Petitioner.  Petitioner dismisses much of the evidence as circumstantial, but even circumstantial evidence may be used to support a conviction and withstand habeas review.  Williams v. Cain, 408 Fed. Appx. 817 (5th Cir. 2011) ("This evidence, though circumstantial, is constitutionally sufficient to support the jury's conclusion that Williams committed the offenses."); US v. Reyes, 227 F.3d 263, 267 (5th Cir. 2000) ("In addition, we have repeatedly held that circumstantial evidence alone is adequate to support a conviction of conspiracy."); and Brian Means, Postconviction Remedies, § 31:1 ("although mere suspicion and speculation cannot support logical inferences, circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction").  Petitioner continues to attack the credibility of Mr. Leloup, but the state court found him credible, and such credibility determinations are squarely within the province of the trier of fact.  "[U]nder Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995).

Petitioner fairly presented his sufficiency of the evidence arguments to the state court.  The state court conscientiously applied Jackson to the facts.  Habeas relief is not available with respect to any of these arguments unless that decision was an objectively

unreasonable application of <u>Jackson</u>.  The state court decision appears, to the contrary, to be an entirely reasonable application of the proper legal principles.  It may be debatable, at least in Petitioner's mind, but it is certainly not unreasonable.  Habeas relief is not available with respect to any of the sufficiency of the evidence arguments.

**Playing Grand Jury Testimony at Trial**

Petitioner complained on direct appeal that the use of his grand jury testimony at trial violated the Louisiana constitutional mandate of grand jury secrecy and was impermissible under the Louisiana Code of Evidence because attacks on credibility may not be made until the witness has been sworn.  The state appellate court reviewed these state law issues and found they lacked merit. <u>State v. Lloyd</u>, 161 So.3d at 894-96.

Petitioner's habeas petition repeats his claims that the use of the grand jury testimony violated the Louisiana Constitution, Code of Criminal Procedure, and Code of Evidence.  The habeas statute provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." <u>Swarthout v. Cooke</u>, 131 S.Ct. 859, 861 (2011).  "Errors of state law, including evidentiary errors, are not cognizable in habeas corpus." <u>Wood v. Quarterman</u>, 503 F.3d 408, 414 (5th Cir. 2007), quoting <u>Derden v. McNeel</u>, 978 F.2d 1453, 1458 (5th Cir. 1992). Habeas relief is not available even if Petitioner is correct on these state law claims.

**Request for Examination of Mr. Leloup's Grand Jury Testimony**

Prior to trial, the defense asked the trial court to conduct an in camera inspection of the grand jury testimony of any witness to determine whether it contained material favorable to the defense that must be turned over pursuant to Brady v. Maryland, 83 S.Ct. 1194 (1963). Judge Pitman conducted that inspection and found no exculpatory material. After the trial held before Judge Bleich, the defense renewed the request that the court review the grand jury testimony of Mr. Leloup to determine whether there were inconsistencies between his trial testimony and grand jury testimony. Judge Bleich, without objection from the prosecutor, conducted the review. He found that there was "no exculpatory evidence or Brady material in those pages, and actually finds that his testimony was remarkably consistent, time of day, curiosity, thought there was a firecracker, various other details that I recall, with his trial testimony." Tr. 584-89.

Petitioner renewed this argument on direct appeal, arguing that the court should review Mr. Leloup's testimony for potential inconsistencies regarding the time the incident happened, whether he heard only a pop or also heard an argument, whether it was still daylight outside, and whether he testified regarding offers of leniency with respect to criminal charges pending against him (which Petitioner asserts were dismissed about a week after Leloup's trial testimony). The appellate court conducted its own review of the grand jury testimony, "paying particular attention to the factors enumerated by the defendant in his brief." The appellate court found "no inconsistencies or any other exculpatory material that should have been disclosed to the defendant." State v. Lloyd, 161 So.3d at 896-97.

Petitioner repeats this argument in his habeas petition. The <u>Brady</u> rule includes impeachment evidence as well as exculpatory evidence. <u>United States v. Bagley</u>, 105 S.Ct. 3375 (1985). To establish a <u>Brady</u> claim a petitioner must establish that the evidence was (1) suppressed, (2) favorable, and (3) material. <u>Wright v. Quarterman</u>, 470 F.3d 581, 591 (5th Cir. 2006). Evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 115 S.Ct. 1555, 1566 (1995). A petitioner must show a "reasonable probability of a different result." <u>Banks v. Dretke</u>, 124 S.Ct. 1256, 1276 (2004).

This claim was adjudicated on the merits in state court, so habeas relief is available only if that decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). <u>Dickson v. Quarterman</u>, 462 F.3d 470, 477 (5th Cir. 2006). It is not enough that the state court decision applied the law erroneously or incorrectly; rather, the application of the law must be "objectively unreasonable." <u>Mahler v. Kaylo</u>, 537 F.3d 494, 499 (5th Cir. 2008).

Petitioner merely repeats his appellate arguments. The trial and appellate courts have now reviewed Mr. Leloup's grand jury testimony and found no <u>Brady</u> material therein. Petitioner offers nothing but speculation that there might be something there, but that speculation is not sufficient to satisfy his burden under the demanding standard of Section 2254(d). Similar speculative <u>Brady</u> claims based on grand jury testimony have been rejected. <u>See</u>, <u>e.g.</u>, <u>Compton v. Director</u> 2012 WL 460462, *5-6 (E.D. Tex. 2012);

Khanjani v. Thaler, 2010 WL 598913, *7 (S.D. Tex. 2010); and Robinson v. Cain, 2011 WL 890973, *6-7 (E.D. La. 2011).  No relief is permitted with respect to this claim.

**Incomplete Transcript of Grand Jury Testimony**

At trial, the prosecutor played an audio recording of Petitioner's grand jury testimony.  He first stated that he would play "the whole thing," and defense counsel agreed.  The judge was given a written transcript.  At one point, the prosecutor stopped the tape "before it got into a particular line of questioning that may or may not be admissible at this trial."  The prosecutor elected to resume playing at a particular point, defense counsel asked that he back it up a little before that, and that was done.  The audio recording was introduced into evidence.  Tr. 394-98.  The transcript of Petitioner's grand jury testimony is in the record at transcript 125-95.

Petitioner raised a pro se assignment of error on direct appeal and argued that (1) the transcript did not bear a certificate of the official court reporter and (2) the transcript was allegedly missing a 15-minute discussion with the prosecutor concerning "the distance of 18 inches away from the victim" that was allegedly not played in court during the trial. The appellate court noted that a certified copy of the transcript, including the entirety of Petitioner's testimony, was supplemented into the record.  The court noted that the trial transcript indicated that "a brief portion concerning the defendant's prior convictions was not played for the trier of fact," but there were no other omissions.  The appellate court also noted that it had compared the audio played before the trial court to the certified transcript "and found no discrepancies."  The issue was rejected because Petitioner did not

demonstrate any reasonable likelihood that the record was deficient or that he suffered any prejudice from the alleged inadequacy of the record.  State v. Lloyd, 161 So.3d at 899-900.

Petitioner's habeas arguments related to this claim rely on the Louisiana Code of Evidence, the Louisiana Constitution regarding the right to appeal, and the Louisiana Code of Criminal Procedure regarding the recording of proceedings in felony cases.  As noted above, federal habeas relief may not be obtained based on state law errors.  The federal court does not review a state court's interpretation of its own law in a federal habeas corpus proceeding and does not sit as a "super" state supreme court to review errors under state law.  Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991).

The only federal law invoked by Petitioner is the Court Reporter Act, 28 U.S.C. § 753, but that statute applies to proceedings in federal district courts rather than state courts. Petitioner also cites a Supreme Court decision that recognized the right to a complete trial transcript for use on appeal.  But the state appellate court found that the record was complete.  Such "a determination of a factual issue made by a State court shall be presumed to be correct" and the "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Petitioner has not met his heavy burden with respect to that issue.

**Ineffective Assistance of Counsel**

Petitioner argued on direct appeal that his trial counsel, Stephen Glassell, rendered ineffective assistance because he did not conduct a medical pretrial background investigation to find support for the theory that Petitioner's health condition contributed to him firing the shot.  To prevail on the claim, Petitioner had to establish that his counsel's

performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

The trial judge stated in his findings, after the close of the evidence, that it was "uncontradicted that the victim did not have a weapon, he did not get out of his car, he made no verbal threat.  The only thing he did was drive into the driveway, leaving the only question being how did the bullet hit the victim."  The court concluded from the totality of the circumstances that Petitioner fired the shot without justification and, with the aid of his mother, attempted to get away without being discovered.  The court turned to Petitioner's physical condition. The defense urged that Petitioner did not intend to fire the gun and perhaps did so due to some twitch or aberration.  The court noted that there was "no medical testimony presented at all to show the extent of the defendant's physical condition," leaving only self-serving evidence in that regard.  The court added that Petitioner was not so physically disabled that he could not retrieve his gun, rack the slide, fire it, then take the gun and hide it after apparently emptying the chamber of the live round that would have been automatically loaded after he fired the fatal shot.  "This defendant was not an invalid." Tr. 575-77.

Petitioner raised the ineffective assistance of counsel claim on direct appeal.  The state appellate court observed that counsel did not present any medical evidence about his client's physical and mental disabilities, but the court afforded great deference to counsel's tactical decisions and trial strategy.  The court noted that counsel "thoroughly cross-examined Mrs. Lloyd about her son's condition," and Petitioner's grand jury testimony

contained much detail about his medical condition. The court concluded that, even if medical testimony had been introduced, there was no explanation as to how it would have negated the evidence that Petitioner intentionally walked to his truck, grabbed his gun, fired a fatal shot at close range, and fled the scene. The court similarly dismissed arguments that counsel should have interviewed Petitioner's doctors or presented evidence that Petitioner was referred to outpatient psychiatric care for his PTSD (after serving in the National Guard during Desert Storm). The state court found that, given the other evidence of record, there was no reasonable probability that, had these matters been pursued, the outcome of the trial would have been different. State v. Lloyd, 161 So.3d at 901-02.

Petitioner continues to press this argument in his habeas petition. Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009).

Reasonable minds might disagree on whether defense counsel should have further investigated the medical issues, but the state court made a reasoned and reasonable application of Strickland to the facts at hand and denied relief. For the federal court to grant relief, "[t]he state court decision must be so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quotation marks removed).  Again, some persons might find issue with the state court's decision, but it appears at least reasonable to the undersigned, and certainly not beyond any possibility for fair-minded disagreement.

In addition, the claim essentially faults counsel for not calling certain witnesses. "Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain." Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010).  A petitioner who makes such a claim must demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the proposed testimony, and showing that the testimony would have been favorable to a particular defense.  Id., citing Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).  See also Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000) (reversing grant of habeas relief for lack of such a showing).  There has been no such showing in this case.

The habeas standard for a Strickland claim is difficult to meet.  Harrington v. Richter, 131 S.Ct. 770, 786 (2011) (addressing claim that counsel should have presented expert testimony on blood evidence).  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  Id.  Thus, "even a strong

case for relief does not mean the state court's contrary conclusion was unreasonable." Id. Given that heavy burden, habeas relief is not permitted on this claim.

**Brady and Napue Claims; Victim's Alleged Gun**

Defense counsel filed a motion for discovery and a motion for evidence favorable to the defense. Tr. 7-8. The State filed a response (Tr. 10) and a supplemental response (Tr. 35) that included a number of detailed police reports. The text of the reports is consistent with the testimony and statements at trial and throughout the proceedings that the victim did not have a weapon.

Petitioner, in his post-conviction application, seized upon a Property Supplement form prepared by Officer Gipson that noted a pistol had been used in a crime. In the spaces on the form for size and color, he wrote 22 and BLK. Tr. 13. In a property/vehicle supplement, Gipson listed the victim's green Buick and a pistol described as a black revolver, with a code for "used in crime." Tr. 56. However, nothing in Gipson's narrative reports, the narratives from the other officers, or Gipson's testimony mention finding a gun on the victim or in his car. Everything else in the record indicates that the victim did not have a weapon on his person or in his car.

Petitioner argues that these two reports show that the State concealed evidence of a firearm located in the victim's car. He argued that the information was not turned over to the defense as required by Brady and that prosecution witnesses lied about the victim being unarmed, in violation of Napue. Brady requires a showing that the evidence was (1) suppressed, (2) favorable, and (3) material. To establish a Napue claim, a petitioner must show "that (1) the witness gave false testimony; (2) the falsity was material in that it would

have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false."  Reed v. Quarterman, 504 F.3d 465, 473 (5th Cir. 2007), citing Napue v. Illinois, 79 S.Ct. 1173 (1959).

Petitioner first raised this issue on direct appeal as a claim for a new trial based on newly discovered evidence.  The appellate court denied the claim because the police reports mentioning the firearm were served on the defense prior to trial.  The issue was not raised in the trial court, which waived it.  State v. Lloyd, 161 So.3d at 898-99.  Petitioner renewed the argument as a Napue/Brady claim in his post-conviction application.  Judge Brady O'Callaghan noted that the reports were provided to the defense before trial, and the defense did not use the property supplement to attempt to impeach the testimony of any prosecution witnesses that Petitioner now claims perjured themselves.  Furthermore, a firearm was not depicted in any of the crime scene photographs, and the reports did not list the location where the alleged pistol was found.  The court denied the Brady claims because the reports were provided to the defense, and it denied the Napue claim on the grounds that Petitioner did not prove the falsity of any witness testimony that the victim was unarmed. Tr. 1032-34.  The appellate court denied a writ application "on the showing made."  Tr. 1239.  The supreme court denied a writ application and noted that Petitioner "fails to show that the state withheld material exculpatory evidence in violation of Brady" and failed to satisfy his post-conviction burden with respect to his other claims.  Tr. 1338-39.

Petitioner continues to argue that he has discovered evidence that the victim possessed a gun, the prosecution covered up that fact, and witnesses lied about it.  The reports are ambiguous, and there is no support in the more detailed reports and testimony

for the contention that the victim was armed with a pistol or other weapon.  In any event, the reports were provided to the defense before trial, and Petitioner never claimed that he saw the victim with a weapon.  Absent Petitioner claiming he fired his pistol based on the victim having a gun, the evidence is not material.

To prevail on a Brady or Napue claim, Petitioner must establish that the state court's decision of these claims on the merits involved an unreasonable application of clearly established Supreme Court precedent or was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1)-(2); Reeder v. Vannoy, 978 F.3d 272, 276-77 (5th Cir. 2020).  The state court's decision was an entirely reasonable and well-reasoned application of Brady and Napue to the facts in the record, so habeas relief is not permitted on these claims.

**Involuntary Confession**

Detective Strickland testified that he read Petitioner his Miranda rights when he first spoke to him at the police station.  Petitioner stated that he wanted an attorney, so police proceeded to interview other persons.  Strickland testified that Petitioner later initiated contact with him and said that he wanted to give a statement.  Strickland advised Petitioner that Miranda still applied and asked if he understood his rights, and Petitioner elected to proceed without an attorney.  Tr. 381-84.  The transcript of the interview begins at Tr. 678. Petitioner began by stating that his mother suggested "maybe I should talk to the police and explain to them what happened."  Petitioner explained the events from his perspective in a free-flowing narrative, without prodding or aggressive questioning from the police.

Petitioner argued on appeal that his statement was involuntary because (1) he invoked his right to counsel and (2) he was not of competent mind because of his stroke and unwillingly gave his statement only to appease his mother. The appellate court noted that the State had to prove the voluntariness of the statement before it was admitted at trial, and the trial judge found it admissible. The records show that Petitioner was "fully advised of his Miranda rights and that he executed a written waiver of rights," and the State affirmatively proved that the confession was not made under the influence of duress, intimidation, or police coercion. The court noted that Petitioner's mental capacity was never questioned during the proceedings, and there was no evidence of diminished capacity introduced at trial. As for the role of his mother, there was no indication that she was a state actor to which Miranda would apply. State v. Lloyd, 161 So.3d at 900-01.

In Miranda v. Arizona, 86 S.Ct. 1602 (1966) the Court held that once a person in custody invokes his right to counsel, interrogation "must cease until an attorney is present." An accused who requests an attorney, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 101 S.Ct. 1880, 1185 (1981). The Edwards rule is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights" and "ensures that any statement made in subsequent interrogation is not the result of coercive pressures." Minnick v. Mississippi, 111 S.Ct. 486, 489 (1990), quoting Michigan v. Harvey, 110 S.Ct. 1176, 1180 (1990).

Petitioner offers only a brief argument that his request for counsel should have protected him from any other questioning.  He does not, however, address the evidence that he initiated the communication with police that led to his statement.  There is no evidence that the police initiated this communication, and Petitioner's own statements indicate that it was his idea after consulting with his mother.

As for the role of Petitioner's mother, it is only police coercion that can render a statement involuntary within the meaning of the Fourteenth Amendment.  The influence of Petitioner's mother or his alleged mental condition, apart from any official police coercion, is not determinative.  Colorado v. Connelly, 107 S.Ct. 515 (1986) (murder confession by mentally ill man was voluntary because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").   Mental impairment or intoxication are considerations in determining the voluntariness of a statement, but only when there is also official coercion.  See James v. Cain, 468 Fed. Appx. 401 (5th Cir. 2012) (denying habeas by mentally challenged man who waived Miranda and confessed to murder); Martinez v. Quarterman, 270 Fed. Appx. 277, 290 (5th Cir. 2008) (denying habeas claim of being intoxicated when giving a written confession); and Sosa v. Dretke, 133 Fed. Appx. 114, 119 (5th Cir. 2005) (denying habeas to petitioner who made statements when he had a mental impairment but in the absence of police coercion).  The state court's rejection of these claims on the merits was not an objectively unreasonable application of any clearly established federal law, so habeas relief is not permitted.

**Other <u>Brady</u> Claims**

Petitioner's post-conviction application asserted <u>Brady</u> claims that are the same or similar to issues addressed above.  He argued that the State suppressed the alleged .22 caliber pistol mentioned in the property supplement report.  The trial court judge held that there was nothing in the record that indicated such a weapon was recovered from or belonged to the victim, and the defense was provided the property supplement prior to trial. Petitioner argued that the State withheld grand jury testimony from Daniel Leloup.  The trial court pointed out that this issue was addressed at trial and by the appellate court, and neither court found inconsistencies or a basis for providing the testimony to comply with <u>Brady</u>.  Petitioner next argued that the State violated <u>Brady</u> by withholding the grand jury testimony of the investigating officers, which he based on his allegation that the officers withheld evidence of the alleged .22 pistol.  The trial court pointed out that the information in the property supplement was not withheld from the defense, and the defense did not request an in camera inspection of the officers' grand jury testimony prior to trial.  Finally, Petitioner argued that the State violated <u>Brady</u> by withholding the criminal record of Mr. Leloup.  The court found that the defense had been provided with a rap sheet, a DMV photo, and the DMV operator query for Leloup.  Trial counsel also cross-examined Leloup about his criminal history.  PCA ruling at Tr. 1033-35; cross-examination at Tr. 366-77, 373.

The trial court's opinion on these issues, which was the last reasoned state court decision on them, is a reasonable application of <u>Brady</u>.  Petitioner offered no more than conclusory assertions that favorable evidence existed and was concealed, or that it would

have been material.  "[M]ere conclusory allegations do not raise a constitutional issue in a habeas proceeding."  Ross v. Estelle, 694 F.2d 1008, 1012 (5th Cir. 1983).  These claims should be denied.

**Additional Ineffective Assistance of Counsel Claims**

Petitioner filed an amended petition (Doc. 5) in which he argued that trial counsel was "reportedly" given evidence in discovery that indicated the victim was armed with a .22 pistol, which would have supported the self-defense theory.  Petitioner argues that counsel was ineffective for failing to take advantage of that evidence at trial.  Petitioner submits a letter from defense counsel in which counsel stated that he "found no reference in any of the reports to a .22 caliber pistol" but did see "several references to the box of .22 caliber shells found near the pistol at your residence."  He asked Petitioner to please send him the reports that referenced the pistol allegedly found in the victim's car.  Doc. 5-1, p. 13.  Petitioner made a related argument that appellate counsel was ineffective for failing to pursue the related Brady and Napue claims on appeal.

The trial court, which issued the last reasoned opinion on this issue, noted that these claims are based solely on the reference to a pistol in the property supplement, which was not supported by any of the other evidence of record.  The supplement did not prove that the victim was armed or that Petitioner acted in self-defense.  The court found that counsel's decision not to pursue that issue at trial, without more support, did not establish deficient performance or prejudice.  The related claim of ineffective assistance of appellate counsel was rejected because the underlying Brady and Napue claims had been found meritless.  Tr. 1036-38.

The ineffective assistance of trial counsel is assessed under the <u>Strickland</u> standard discussed above.  With respect to appellate counsel, Petitioner must show that had the <u>Brady</u> and <u>Napue</u> issues been raised there was a reasonable probability that he would have won on appeal.  <u>Smith v. Robbins</u>, 120 S.Ct. 746, 764 (2000); <u>Moreno v. Dretke</u>, 450 F.3d 158, 168 (5th Cir. 2006).  Petitioner has not made any such showings.  More important, he has not demonstrated that the state court's adjudication of these claims on the merits was an objectively unreasonable application of <u>Strickland</u>, <u>Smith</u>, or other clearly established federal law.

**Cumulative Error**

Petitioner argued in his post-conviction application that the cumulative effect of the errors raised in his application denied him a fair trial.  The state court denied the claim because it had earlier determined that each of the alleged errors lacked merit.  Tr. 1038.  This court should also deny the claim.

Cumulative error on federal habeas review is a narrow and rare form of due process violation.  <u>Derden v. McNeel</u>, 978 F.2d 1453, 1461 (5th Cir.1992) (en banc).  The petitioner must show, among other things, that individual errors of constitutional dimension (rather than mere violations of state law) so infected the entire trial that the resulting conviction violates due process.  <u>Allen v. Vannoy</u>, 659 Fed. Appx. 792, 818 (5th Cir. 2016).  Petitioner's mere repetition of his prior claims, each of which has been rejected on the merits, does not make out a rare case for relief.  The state court's denial of this claim on the merits was not an unreasonable application of clearly established federal law, so habeas relief must be denied on this claim.

**No Post-Conviction Hearing**

Petitioner complained in Doc. 9 that the state courts violated the First, Ninth, and Fourteenth Amendments because he was not afforded an evidentiary hearing on his post-conviction application, which he argues was warranted under state procedural law.  This claim must be denied because "[i]t is axiomatic that infirmities in state habeas proceedings under state law are not a basis for federal relief."  Wiley v. Epps, 625 F.3d 199, 207 (5th Cir. 2010).  The rule has been applied to reject a habeas claim that the state court should have held an evidentiary hearing on a post-conviction application.  Mathis v. Dretke, 124 Fed. Appx. 865, 871-72 (5th Cir. 2005).  Petitioner is not entitled to habeas relief based on this claim.

**Appellate Judges Recusals; Prosecutor Fired/Disciplined**

Petitioner does not assert it as a specific exhausted claim, but he argues in his traversal (Doc. 27, pg. 5) that it was somehow improper that appellate judges Bleich, Brown, and Pitman recused themselves from his appeal.  Recusal orders at Tr. 1232-34.  Judge Bleich is a retired judge who sat pro tempore to hear Petitioner's trial.  When he later served on the appellate court, he correctly recused himself from hearing the appeal of his own decision.  Appellate Judge Frances Pitman is married to Judge Michael Pitman, who presided over some of the trial court proceedings, and Judge Henry Brown is the father of ADA Jason Brown who prosecuted Petitioner at trial.  Thus, there is nothing suspicious or improper about the recusals.

Petitioner has also filed news articles that report ADA Jason Brown was fired from one prosecutor job and suspended from another.  Docs. 30 and 35.  The articles say nothing

about Brown's conduct in this proceeding, and Petitioner has not exhausted his state court remedies on any claim based on any alleged misconduct by ADA Brown in this case. Habeas relief cannot be granted based on these news reports.

Accordingly,

It is recommended that the petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules

Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 1st day of November, 2021.

Mark L. Hornsby
U.S. Magistrate Judge